Donald K. SCHULTZ and Carl W. Schultz

v.

UNITED STATES of America.

No. 1083.

United States District Court
D. Maine, S. D.
Aug. 25, 1959.

See also 174 F.Supp. 488.

William A. Blank, Brooklyn, N. Y., Philip M. Isaacson, Lewiston, Me., Robert C. Zampano, East Haven, Conn., for plaintiffs.

Peter Mills, U. S. Atty., Portland, Me., for defendant.

GIGNOUX, District Judge.

This is an action against the United States of America under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346(b), 2671–2680, to recover damages for personal injuries sustained by the plaintiff Donald K. Schultz as the result of his accidental shooting by Robert S. McAfee on April 29, 1953, at Fort Foster, a United States Government Reservation located approximately five miles from the Portsmouth Naval Base at Kittery, Maine. Plaintiffs seek $100,000 damages for the personal injuries, pain and suffering and loss of earnings and earning capacity sustained by Donald, and for the medical and hospital expenses and loss of services sustained by his father, the plaintiff Carl W. Schultz, as a result of the shooting. Defendant counterclaims for the cost of hospital care furnished to Donald at the United States Naval Hospital, Portsmouth, N. H., from April 28, 1953 to July 2, 1953, in the stipulated amount of $912.

Pursuant to the provisions of Rule 42 (b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., the Court ordered separate trials of the issues of liability and damages. The evidence with respect to the issues of liability was heard by the Court on March 24, 25, 26, 27 and 30, 1959, and on June 24, 1959 the Court filed its opinion and order resolving these issues in favor of the plaintiffs and directing that judgment be entered for the plaintiffs, with costs, in amounts to be determined by the Court following a hearing upon the issues of damages. In accordance with the stipulation of the parties, the Court further ordered that judgment be entered for the defendant upon the counterclaim in the amount of $912, without costs.

The evidence upon the issues of damages was heard by the Court on August 17, 18 and 19, 1959. The medical evidence on behalf of the plaintiffs consisted of the testimony of Dr. John W. Trenton, former Chief of Surgery at the Portsmouth Naval Hospital, who treated Donald from the date of the accident to November 3, 1953, when he was admitted to the Children's Medical Center at Boston, Massachusetts; and the testimony of Dr. William T. Green, Chief of Orthopedic Surgery at the Children's Medical Center, who treated Donald upon his admission to the Children's Center and has continued supervisory care since. The defendant presented the testimony of Dr. Richard F. Mayer, Chief Neurologist at the U. S. Naval Hospital, Chelsea, Massachusetts, who examined Donald during the course of the hearing. All relevant hospital and medical records and reports, including X-rays, were received in evidence. Donald himself testified, and his mother testified in support of the various items of special damages claimed by his father. Upon the basis of the evidence thus presented, the Court makes the following findings and conclusions as required by Rule 52(a) of the Federal Rules of Civil Procedure.

At approximately noon on April 29, 1953 Donald was shot in the back by a

.22-calibre long-rifle bullet fired by Robert S. McAfee. He was removed to the Portsmouth Naval Hospital, where preliminary examination showed a gunshot wound and accompanying injury to the spinal cord at approximately the level of the 11th and 12th dorsal vertebrae, with the patient suffering moderately severe pain in both legs, total paralysis of the left leg, and almost complete paralysis of the right leg. An exploratory laparotomy was immediately performed, followed two days later by a laminectomy, in the course of which the spinous processes and laminae of the 10th, 11th and 12th dorsal vertebrae were removed. Operative and X-ray reports indicated that the bullet fired by young McAfee had entered Donald's back at a point approximately 7 cms. to the left of the 11th dorsal vertebra, had passed through the body of the 11th dorsal vertebra, had punctured the liver and the diaphram, and had come to rest in the anterior portion of the abdomen. Examination of the spinal cord revealed no apparent laceration of the cord itself, but indicated that the trauma arising from the impact of the bullet upon the vertebral body had caused a neurologic lesion, with resulting impairment of the lower extremities, bladder, urinary tract and bowel functions.

Donald remained at the Portsmouth Naval Hospital until July 2, 1953. His injuries were of such a nature that for some time it was doubtful that he would ever walk again, and he was so informed by Dr. Trenton. During the initial period of his hospitalization he had no voluntary movement of either leg and was a totally immobilized bed patient. He received two blood transfusions, catheterization and daily enemas were necessary because of his inability to control his bladder and bowels, and he was kept under constant sedation because of acute pain in his legs, buttocks and back. A month after his admission a limited physical therapy program was instituted in an attempt to improve the functioning of his lower extremities. Despite a complicating phlebitis in the left leg, which occurred in early June, slow but reasonably steady progress was made. At the time of his discharge, Donald's right leg was bearing weight and his left leg appeared to be improving, although he was still in much pain and unable to get around by himself even on crutches. During this entire period, of course, Donald suffered severe pain and mental distress, aggravated by acute embarrassment and anxiety over his condition, a factor which seriously impeded his recovery.

Following Donald's discharge from the Portsmouth Naval Hospital, he was taken to his parents' summer camp on a Maine lake where a rigorous physical therapy program, under the supervision of Dr. Trenton, was continued until September, when Donald returned with his parents to their home in Portsmouth and attempted to resume studies with his class at the Portsmouth High School. At this time he was able to get around, although with difficulty, with the aid of a cane.

In early November, 1953 an acute pain developed in Donald's left hip, and he was referred to Dr. Green at the Children's Medical Center in Boston. Examination showed he was suffering from severe pain in his left hip, loss of use of his left leg, involving marked spasticity and clonus of the entire left lower extremity, great pain on motion, a long scar and deformity of the spine, much muscle spasm and discomfort. X-rays revealed an epiphyseal dislocation of the left lesser trochanter; a comminuted fracture of the 11th dorsal vertebra causing compression of the vertebral body and a marked wedging deformity of the spine involving the 10th, 11th and 12th dorsal and 1st lumbar vertebrae, the 11th and 12th dorsal vertebrae being the center of the wedging; and associated with the spinal deformity a kyphos at the same level with some scoliosis and a secondary lordosis of his lumbar spine. Donald was placed in traction for approximately a week in order to reduce the spasm, following which a full body spica cast was applied. He remained at the Center until November

16, 1953. On December 14, 1953 he was readmitted to the Center for five days in order that the full body cast might be removed and replaced by a bivalved spica cast to permit limited physiotherapy. He was readmitted to the Center in mid-January, 1954 for removal of the spica cast, and in February and April, 1954 for further examination and instruction in rehabilitation exercises. From December, 1953 through June, 1954 he was visited twice a day by a physical therapist from the Portsmouth Naval Hospital. He was confined to a wheelchair for several months and was still on crutches when he reentered Portsmouth High School in September, 1954. It was not until early 1956 that he was able to get around without either crutches or a cane. Dr. Green continued to see Donald from time to time until May, 1955, but has only seen him three or four times since. His most recent examination was in June of this year.

Although Donald has made a fair recovery and has been able to resume his schooling, he is still able to walk only with a halting gait, involving a circumduction of the left leg, which precludes any normal physical activity. He also continues to suffer intermittent spasm or clonus in his left lower extremity, with pain and discomfort in his left leg and hip and his back. Sustained standing or walking remains difficult.

The findings of Dr. Green and Dr. Mayer as to Donald's present condition were essentially the same: His primary disability is spasticity and poor control of his lower left extremity, which is extremely rigid or stiff, limited in motion and gives rise to great difficulty even in a walking gait. Associated with his spasticity is hyper-reflexia and clonus. He has an extension deformity of his left knee, which he can flex only a few degrees, an equinous deformity of his left foot and a defect in his spine affecting the 10th, 11th and 12th dorsal and 1st lumbar vertebrae, with the 11th and 12th dorsal vertebrae and inter space most involved. He has a residual displacement of the left lesser trochanter which is now fused to the shaft. Associated with his spinal deformity is a marked kyphos, with some mild scoliosis and a secondary increased lordosis of his lumbar spine. In addition, Donald has a congenital spondylolisthesis of his 5th lumbar vertebra on the sacrum, which is not associated with his injuries from the accident here involved but could be a future aggravating factor. The doctors are in agreement that Donald's disability is attributable to the neurologic lesion of the spinal cord resulting from the gunshot wound. Dr. Green testified that his condition is one which will not materially improve and which could become worse. Dr. Mayer estimated the present disability of the left leg at 60 to 70%, although expressing the opinion that with proper guidance and continued activity the disability could be reduced to 40 to 50%.

In summary, Donald has and will always have only limited use of his left leg. He can walk around without crutches or a cane, but only with a halting gait and with difficulty. Although his gait may improve with practice, his over-all functioning is permanently impaired. He is not presently in any acute distress and can stand erect, but with an observable tilting of his carriage. In addition, he has suffered the structural changes in his spine which have caused, and probably will continue to cause, him pain and discomfort. Bladder control and chronic constipation, both attributable to the spinal cord injury, are still problems. A complicating factor is his psychological reaction to his misfortune and the resulting embarrassment and anxieties which have made it difficult for him to resume a normal life. Psychiatric assistance may be indicated.

Prior to the injury Donald was a normal, well-developed, socially adjusted, athletically motivated boy of fifteen years. He was a freshman at the Portsmouth High School and a good student. He has been able to continue his education, essentially without loss of grade, and anticipates entering the senior class at Co-

lumbia University this fall. His expressed desire is to become a lawyer, and he has been taking a pre-law college course. According to the Commissioners 1958 Standard Ordinary Mortality Tables, Donald's life expectancy at the time of the accident was 54.95 years and at the present time is 49.46 years.

The foregoing is a fair summary of the testimony as to the personal injuries sustained by Donald as the result of his tragic accident. Of course, it is extremely difficult to translate these injuries into terms of dollars. And there can be no question but that no amount of money can truly compensate this young man. However, the Court must endeavor to arrive at a fair estimate of the amount which it feels should be awarded to Donald for his injuries. In doing so, the Court has given due consideration to the severe nature of the injuries, to the long and protracted period of pain and suffering, to the impairment of physical activity, to the permanent disability and to the deformity sustained by him. The Court has also considered the effect of this disability upon Donald's earning capacity and the probable future physical and psychological complications. And so, upon the basis of all of the evidence, the Court has arrived at the amount which it feels should be awarded to Donald for the personal injuries, pain and suffering, loss of earnings, medical expense and physical disability, past, present and future, which he has suffered and will continue to suffer as a result of this accident. The Court fixes that sum at $60,-000. The parties having stipulated that there be set off against the amount of the Court's award to Donald in this action, the sum of $15,000 received by him in settlement of the companion case brought by him and his father against Captain Jesse S. McAfee, Schultz v. McAfee, D.C., 160 F.Supp. 210, judgment is accordingly ordered for the plaintiff Donald K. Schultz against the defendant United States of America in the amount of $45,000, with costs.

Insofar as the claim of the plaintiff Carl W. Schultz is concerned, the parties have stipulated medical and hospital expenses to the extent of $2,597.80, including the amount of the judgment to be entered for the defendant on the counterclaim for the cost of hospital care furnished to Donald at the Portsmouth Naval Hospital in the sum of $912. The uncontroverted testimony of Donald and his mother supports an additional award for special damages incurred by his father in the total amount of $2,500. Judgment is accordingly ordered for the plaintiff Carl W. Schultz against the defendant United States of America in the amount of $5,097.80, with costs.

In accordance with the stipulation of the parties, judgment is ordered for the defendant United States of America against the plaintiff Carl W. Schultz, upon the counterclaim, in the amount of $912, without costs.